1
2
3
4                       UNITED STATES DISTRICT COURT
5                            DISTRICT OF NEVADA
6                                    * * *
7    TERESA DAVILA,                          Case No.  2:16-cv-01138-JAD-GWF
                              Plaintiff,
8            v.                              **REPORT AND RECOMMENDATION**

9    NANCY A. BERRYHILL, Acting              **Re:  Motion for Reversal and/or**
     Commissioner of Social Security,            **Remand (ECF No. 15)**
10
                              Defendant.
11
12
13

14          This case involves judicial review of an administrative action by the Commissioner of

15   Social Security denying Plaintiff Teresa Davila's claim for disability benefits under Title XVI of

16   the Social Security Act.  Plaintiff filed her Motion for Reversal and/or Remand (ECF No. 15) on

17   April 10, 2017.  The Commissioner filed her Cross-Motion to Affirm (ECF No. 17) and

18   Opposition to Plaintiff's Motion to Remand (ECF No. 18) on May 10, 2017.

19                                    **BACKGROUND**

20          **A.  Procedural History**

21          Plaintiff filed an application for a period of disability and disability insurance benefits

22   on August 16, 2012 in which she alleged that her disability began on May 1, 1983.

23   Administrative Record ("AR") 190.  The Social Security Administration denied Plaintiff's claim

24   initially on December 18, 2012 and upon reconsideration on June 13, 2013.  AR 72.  Plaintiff

25   requested a hearing before an Administrative Law Judge ("ALJ") which was conducted on

26   March 20, 2014.  AR 83.   Plaintiff and a vocational expert testified at the hearing.  The ALJ

27   issued his decision on May 22, 2014 and concluded that Plaintiff was not disabled at any time

28   between the date her application was filed and the date of the decision.  AR 79.  The Appeals

Council denied her request for review on March 25, 2016.  AR 1-7.  Plaintiff then commenced this action for judicial review pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned for a report of findings and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C).

**B. Factual Background**

**1. Plaintiff's Disability Reports and Hearing Testimony**

Plaintiff was born August 3, 1970.  She is 5'2" tall and weighed 268 pounds at or about the time of her application.  AR 98.  She resided with her husband and four children whose ages ranged from twenty-three years to eleven months old.  Plaintiff attended school through the eleventh grade.  AR 87.  She never obtained a driver's license.  AR 86.  Plaintiff did not work outside the home during the fifteen years preceding her disability application, except for a brief period as a bus person in 2008, and as an animal groomer in 2011.  AR 94-95, 215.  She was terminated from her bus person job after she had a seizure that caused her to fall and spill drinks on a customer.  AR 94.

Plaintiff stated that she was unable to work due to epilepsy and seizures.  AR 214.  According to an August 16, 2012 disability report, Plaintiff had no difficulty hearing, breathing, understanding, concentrating, talking, answering, standing, walking, seeing or using her hands.  She was well-groomed and had no difficulty answering questions.  AR 211.  Plaintiff completed a seizure questionnaire on October 15, 2012 in which she reported experiencing seizures approximately once a month.  She lost consciousness, had convulsions, bit her tongue and had loss of bladder control.  She was able to resume normal activities within 1 or 2 hours after a seizure.  AR 228.  She had previously taken Dilantin for the seizures, but had not taken that medication for the past four years.  Plaintiff did not go to a hospital emergency room for seizures in the past twelve months.  She did not have a treating doctor for her seizures.  She had an EEG 5-6 years prior to the date of the questionnaire.  AR 229-230.

Plaintiff testified at the March 20, 2014 hearing that she was diagnosed with diabetes approximately seven years earlier.  She took a pill for the diabetes, and stated that "it's being controlled a little bit."  AR 90.  Her most recent seizure had occurred three days before the

hearing.  She was taking Keppra medication for the seizures which did not control them "much."  AR 88.  Her doctor had recently increased the dosage of her medication.  AR 89.  She could feel the seizures coming on approximately two to three days in advance when she started getting headaches, felt nervous and had blurry eyes.  AR 91.  She lost consciousness for 5-10 minutes after a seizure occurred.  AR 89.  She would wake up tired, sleepy and throwing up.  She felt lazy and weak.  She would stay awake three to four hours after a seizure because of headaches.  Sometimes, she was unable to talk "good" because she bit her tongue.  AR 90.  She had an average of four or five seizures a month, each episode lasting approximately two hours.  During a seizure episode, she would usually lose bladder control and urinate on herself.  AR 92-93.

Plaintiff testified that on a typical day, she cooked breakfast for her little girl, woke-up the other children for school and then cleaned the kitchen.  She watched television until approximately 1:00 or 2:00 p.m., and then started cooking dinner.  She and her husband shopped together.  She had difficulty performing household chores after a seizure because she felt sick and lazy.  AR 91.

**2. Vocational Expert's Testimony**

The ALJ asked the vocational expert to assume a hypothetical individual of the same age and education as Plaintiff, and with no work experience.  The individual was restricted to the medium range of work.  She could not work at unprotected heights or on dangerous machinery.  The individual would not be able to use ladders, but could occasionally climb stairs and ramps, and occasionally stoop and bend.  The individual could not be responsible for safety operations.  The ALJ asked the vocational expert whether there was any work that the individual could perform.  The vocational expert testified that the individual would be able to perform the jobs of laundry marker, linen room attendant, or a box folder, all of which were unskilled, medium exertional level jobs, and for which there were substantial numbers of jobs available in the national economy.  AR 95.

The ALJ asked whether the hypothetical individual would be able to perform any competitive work if she would be off task 20 percent of the time or more due to seizures.  The vocational expert testified that there was no work the individual could perform.  Plaintiff's

counsel asked whether the individual could sustain employment if she missed at least two days of work per month due to seizures. The vocation expert testified that the individual might be able sustain employment for the first or second month, but not thereafter. AR 96.

### 3. Medical Records

Plaintiff was examined by Dr. Robert Moore, a neurologist, on December 3, 2012 at the request of the California Department of Social Services, Disability and Adult Programs Division. AR 250-253. Plaintiff reported a history of seizures dating back to age thirteen. AR 250. She also had a four year history of diabetes which was under control through the use of insulin. AR 251. She was never given an etiology for her seizures and stated that she last took anticonvulsant medications five months prior to her examination. AR 250.

Plaintiff's husband stated that she actually had two types of seizures. The first type occurred approximately once every three months and caused Plaintiff to fall, shake and bite her tongue during an episode. These seizures lasted approximately a minute and Plaintiff would be tired for an hour or so. The second type occurred more frequently. It lasted two or three seconds and was not associated with postictal confusion. Plaintiff would lose contact with the environment and might have some trembling. She might go three weeks without having one of these seizures, and then have one a day for three days. Plaintiff's husband believed these seizures occurred more than five times a month. Apart from the seizures, Plaintiff felt healthy. She did not complain of impaired memory, vision, or hearing. There was no diplopia (double vision), dysarthria (speech impairment) or dysphagia (difficulty swallowing). She had no complaints of focal limb weakness, distal limb incoordination, or limb paresthesia. AR 250-251.

On physical and neurological examination, Dr. Moore noted that Plaintiff was an obese female in no acute distress. She weighed 252 pounds. She was alert and oriented to person, place and time. She recalled three out of three objects after five minutes and distraction. She was able to perform simple calculations, follow three-step commands and repeat three reversed digits. No apraxias (inability to perform purposive actions) or agnosias (inability to process sensory information) was noted. Her fund of knowledge for recent and remote events was appropriate for her educational level. Plaintiff's speech was normal. She had no difficulty

4

naming objects, and  spoke in grammatically correct sentences.  AR 251.  The cranial nerve examination was normal.   Her coordination was normal.  She had normal and spontaneous gait.  She had normal strength, sensation to soft touch, and reflexes.  AR 252.

Dr. Moore noted that Plaintiff had not taken anticonvulsive medications for over five months.  He stated that with appropriate medications, there would be improvement in seizure control.  Plaintiff could not climb, balance, work at heights, work around moving machinery, operate a motor vehicle or use power tools. However, she had the full ability to stand, sit, walk, bend, stoop, lift and carry.  She could operate foot controls and sit in an unrestricted manner.  She had unrestricted use of her upper extremities.  Plaintiff was cognitively intact and could follow simple and complex commands, and perform simple and complex tasks.  AR 253.

Plaintiff was seen at Kaiser Permanente Medical Center beginning on January 11, 2013 for her pregnancy.  Due to her age, obesity, diabetes and seizure history, her pregnancy was classified as high risk.  Plaintiff completed a questionnaire in which she reported a history of seizures and stated that she had taken no seizure medications for 5-6 years because the prescription ran out and she was unable to get more.  AR 261.  Plaintiff reported to Dr. Andryjowicz on February 1, 2013 that she had seizures about once a month and had previously been prescribed Dilantin three times per day, but stopped taking it six years earlier.  AR 285.

On March 4, 2013, Plaintiff provided a further seizure history to Dr. Peyman Andalib, a neurologist.  She stated that she had had seizures since she was 13 years old.  She described the seizures as a feeling of pain on the left side, loss of consciousness, and waking up with headaches, feeling tired and biting her tongue.  She had three to four seizures a month, but had stopped taking Dilantin five years previously.  AR 322.[1]  Plaintiff's physical and neurological examination was normal. AR 323-324.  Dr. Andalib stated that Plaintiff had "a highly complex partial seizure with secondary generalization."  He prescribed Keppra and scheduled Plaintiff for follow-up in 6 months and a brain scan at that time.  AR 324.  On March 20, 2013, Plaintiff informed the physician that she had not been taking the Keppra because it causes uterine

---

[1] Plaintiff reported to a medical assistant on March 4, 2013 that she had seizures approximately once a month and that her last seizure occurred in January 2013.  AR 327.

contractions.  She was advised that uterine contractions were not a concern at her stage of

pregnancy, and that having grand mal seizures were a greater risk to the infant than Keppra.  She

was advised to resume taking the medication.  AR 367.  Plaintiff delivered her child by caesarian

section on April 18, 2013 and was discharged from the hospital on April 20, 2013.  She was

instructed to continue taking Keppra.  AR 429, 454-459.  A May 24, 2013 progress note by Dr.

Andryjowicz stated that Plaintiff was on insulin and Keppra and had not had seizures.  AR 520.

Plaintiff was seen by Dr. Andalib on October 7, 2013.  He noted that Plaintiff had her

baby five months previously and there was no problem with the delivery.  He also stated that

"[s]he had no problem with Keppra and she had 1 [seizure] a month since delivery all grand

mals.  She had few masses in the neck and since yesterday red rashes in the face and forearms."

AR 536.  Dr. Andalib increased the Keppra to 500 mg two times per day and scheduled Plaintiff

for follow up in four months.  He also discussed seizure precautions with her.  AR 537.

On January 13, 2014, Plaintiff contacted the medical center and advised the she was

unable to schedule the follow-up appointment with Dr. Andalib since her last visit in October

2013.  She was continuing to have seizures and was still taking Keppra.  AR 560.  She was seen

on January 15, 2014 and reported having generalized seizures "every couple of days."  AR 568.

Dr. Andalib stated that the Keppra would be increased to 500 mg 3 times per day and Plaintiff

would be scheduled for an EMG.  He stated that Plaintiff had possible symptoms of CTS.

Topamax was the next medication to be started if the seizures did not improve.  AR 569-570.

Plaintiff was seen on January 22, 2014 for a number of medical issues.  There were no additional

notes or findings on that date regarding her seizures.  AR 587-619.  Plaintiff was seen by Dr. Joe

Casillas  on January 29, 2014.  He noted that her "seizures are well controlled with Keppra."  AR

633.  There was no indication in the February and May 2014 progress notes that Plaintiff was

continuing to experience seizures.  AR 647-663.

Plaintiff was seen by Dr. Andalib on July 30, 2014.  She reported that she still had

generalized seizures every other week.  She was taking Keppra 500 mg three times a day.  AR

479.  Dr. Andalib stated that he would keep Plaintiff on Keppra 500 mg 3 bid, and add 50 mg bid

of Topamax.  He indicated that seizure surgery or EEG monitoring would be the next choice.

AR 481. There are no further medical treatment records from Dr. Andalib or Kaiser Permanente in the administrative record after July 2014.

Following the ALJ's May 22, 2014 decision denying her claim for disability benefits, Plaintiff submitted a May 28, 2015 "Report of Illness, Incapacity or, Disability" form signed by Dr. Morton Hyson. Dr. Hyson stated that Plaintiff was permanently disabled due to seizures. AR 16. There is no accompanying medical report, or examination notes setting forth the basis for Dr. Hyson's disability opinion.

**C. Administrative Law Judge's Decision**

The ALJ applied the five-step sequential evaluation process established by the Social Security Administration, 20 CFR § 416.920(a), in determining whether Plaintiff was disabled. AR 72-73. At step one, he found that Plaintiff had not engaged in substantial gainful activity since the date of her application. At step two, the ALJ found that Plaintiff had the following severe impairments: seizure disorder and diabetes. He found that Plaintiff's obesity was not a severe impairment because there was no evidence that it had an impact on her functional capacity. AR 74. At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR §§ 416.920(d), 416.925, and 416.926). AR 75.

Prior to step four, the ALJ found that Plaintiff had the residual functional capacity to perform medium work as defined in 20 CFR § 416.967(c), except that she could not work around unprotected heights or dangerous machinery, could not climb ladders, but could occasionally climb stairs and ramps, and stoop and bend. She could not be responsible for safety operations. The ALJ stated that Plaintiff's medically determinable impairments could reasonably be expected to cause her alleged symptoms, but found that her statements concerning the intensity, persistence and limiting effects of those symptoms were not entirely credible. AR 76.

The ALJ summarized Plaintiff's October 2012 seizure questionnaire, noting that she had not taken seizure medication during the past four years, had not been to the emergency room during the past twelve months, did not have a treating physician, and had not had an EEG in the

past 5-6 years.  The ALJ stated that Plaintiff's testimony that she saw a neurologist at Kaiser Permanente on a regular basis was inconsistent with her questionnaire responses.  AR 76.[2]

The ALJ stated that despite her alleged impairments, Plaintiff engaged in a somewhat normal level of daily activity and social interaction which supported his assessment of her residual functional capacity.  After summarizing Plaintiff's testimony regarding the nature, frequency and duration of her seizures, the ALJ stated that "[d]espite her alleged impairments, she stated she was capable of cooking breakfast for her daughter, getting her kids ready for school, shopping with her husband, and watching television.  She acknowledged that she had problems performing household chores after not before experiencing a seizure."  The ALJ found that Plaintiff's ability to participate in such activities undermined the credibility of her allegations regarding disabling functional limitations.  AR 76.

The ALJ stated that the medical evidence of record did not support the severity of the Plaintiff's allegations or a finding of disability under the Social Security Guidelines.  Plaintiff received routine and conservative care for seizure disorder and diabetes.  Other than her reported seizure symptoms, her physical examination on February 1, 2013 was generally unremarkable.  Plaintiff's statement on March 4, 2013 [to Dr. Andalib] that she stopped taking Dilantin five years ago was inconsistent with her statements during the neurological consultative examination.[3]  The ALJ stated that Plaintiff's failure to take prescribed medications "demonstrate[ed] a possible unwillingness to do what is necessary to improve her condition.  It may also be an indication that her symptoms were not as severe as she purported."  Although not "a primary reason" for his decision, the ALJ stated that Plaintiff's failure to follow prescribed treatment without a good reason was a basis for finding that she was not disabled.  AR 77.

The ALJ gave significant weight to the opinions of the neurology consultative examiner, Dr. Moore, and the State agency medical consultants.  The opinions of these physicians were

---

[2] The seizure questionnaire was completed in October 2012.  Plaintiff did not begin seeing the neurologist at Kaiser Permanente until January or February 2013.

[3] Plaintiff reportedly told Dr. Moore on December 3, 2012 "that she last took anticonvulsant medication five months ago."  AR 250.

generally consistent with one another, and supported by the record as a whole.  AR 77.  The ALJ stated that his determination of Plaintiff's residual functional capacity was based on the objective evidence as a whole.  He noted that Plaintiff was prescribed routine and conservative treatment including medication management.  He again cited her failure to take prescribed medication, and noted that the objective medical findings were generally unremarkable and consistent with his determination.  There was no medical source statement that suggested more restrictive functional limitations.  AR 77-78.

Because Plaintiff did not have past relevant work, the ALJ proceeded to step five of the sequential process.  Based on Plaintiff's residual functional capacity, the vocation expert's testimony, and Plaintiff's age, education and work experience, the ALJ found that she was able to work as a laundry marker, linen room attendant, and box folder.  He therefore concluded that Plaintiff was not disabled.  AR 79.

## **DISCUSSION**

### I.    **Standard of Review**

A federal court's review of an ALJ's decision is limited to determining (1) whether the ALJ's findings were supported by substantial evidence and (2) whether the ALJ applied the proper legal standards.  *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996); *Delorme v. Sullivan*, 924 F.2d 841, 846 (9th Cir. 1991).  The Ninth Circuit has defined substantial evidence as "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Woish v. Apfel*, 2000 WL 1175584 (N.D. Cal. 2000) (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)); *see also Lewis v. Apfel*, 236 F.3d 503 (9th Cir. 2001).  The Court must look to the record as a whole and consider both adverse and supporting evidence.  *Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993).  Where the factual findings of the Commissioner of Social Security are supported by substantial evidence, the District Court must accept them as conclusive. 42 U.S.C. § 405(g).  Hence, where the evidence may be open to more than one rational interpretation, the Court is required to uphold the decision.  *Moore v. Apfel*, 216 F.3d 864, 871 (9th Cir. 2000) (quoting *Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984)); *see also Vasquez v. Astrue*, 572 F.3d

586, 591 (9th Cir. 2009).  The court may not substitute its judgment for that of the ALJ if the evidence can reasonably support reversal or affirmation of the ALJ's decision.  *Flaten v. Sec'y of Health and Human Serv.*, 44 F.3d 1453, 1457 (9th Cir. 1995).

It is incumbent on the ALJ to make specific findings so that the court need not speculate as to the findings.  *Lewin v. Schweiker*, 654 F.2d 631, 635 (9th Cir. 1981) (citing *Baerga v. Richardson*, 500 F.2d 309 (3rd Cir. 1974)).  In order to enable the court to properly determine whether the Commissioner's decision is supported by substantial evidence, the ALJ's findings "should be as comprehensive and analytical as feasible and, where appropriate, should include a statement of subordinate factual foundations on which the ultimate factual conclusions are based."  *Lewin*, 654 F.2d at 635.

In reviewing the administrative decision, the court has the power to enter "a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  In the alternative, the court "may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding."  *Id.*

## II.    Disability Evaluation Process

To qualify for disability benefits under the Social Security Act, a claimant must show that: (a) he/she suffers from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less that twelve months; and (b) the impairment renders the claimant incapable of performing the work that the claimant previously performed and incapable of performing any other substantial gainful employment that exists in the national economy.  *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999); *see also* 42 U.S.C. § 423(d)(2)(A).  The claimant has the initial burden of proving disability.  *Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir 1995), *cert. denied*, 517 U.S. 1122 (1996).  If the claimant establishes an inability to perform his or her prior work, the burden shifts to the Commissioner to show that the claimant can perform a significant number of other jobs that exist in the national economy.  *Hoopai v. Astrue*, 499 F.3d 1071, 1074–

75 (9th Cir. 2007). Social Security disability claims are evaluated under a five-step sequential evaluation procedure. *See* 20 C.F.R. § 404.1520(a)-(f). *Osenbrock v. Apfel*, 240 F.3d 1157, 1162 (9th Cir. 2001). If a claimant is found to be disabled, or not disabled, at any point during the process, then no further assessment is necessary. 20 C.F.R. § 404.1520(a). The ALJ correctly set forth five steps in his decision, AR 73-74, and they will not be repeated here.

## III.    Analysis and Findings

Plaintiff argues that the ALJ failed to provide clear and convincing reasons for discrediting her testimony and statements regarding the severity of her seizure symptoms. The Commissioner argues that the ALJ gave legitimate reasons for rejecting Plaintiff's testimony and statements.

If the claimant has presented sufficient evidence of an underlying physical or mental impairment that could reasonably cause her symptoms, then, in the absence of evidence of malingering, the ALJ must provide specific, clear and convincing reasons for rejecting the credibility of the claimant's testimony regarding the severity of her pain or other symptoms. *Burrell v. Colvin*, 775 F. 3d 1133, 1136-37 (9th Cir. 2014) (citing *Molinay v. Astrue*, 674 F. 3d 1104, 1112 (9th Cir. 1991) (en banc); *Swenson v. Sullivan*, 876 F. 2d 683, 687 (9th Cir. 1989); *Gallant v. Heckler*, 753 F. 2d 1450, 455 (9th Cir. 1984)). The ALJ must state the reasons why the testimony is unpersuasive, and must specifically identify what testimony is credible and what testimony undermines the claimant's complaints. *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F. 3d 685, 693 (2009) (quoting *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F. 3d 595, 599 (9th Cir. 1999)).

The ALJ may not reject a claimant's subjective complaints based solely on a lack of medical evidence to fully corroborate the alleged severity of pain or other symptoms. The rationale for this restriction is that testimony may establish greater limitations than can medical evidence alone. *Burch v. Barnhart*, 400 F.3d 676, 680 (9th Cir. 2005) (citing SSR 96–7p (1996)). In determining credibility, the ALJ may engage in ordinary techniques of credibility evaluation, such as considering claimant's reputation for truthfulness and inconsistencies in claimant's testimony. *Id.* (citing *Tonapetyan v. Halter,* 242 F.3d 1144, 1148 (9th Cir. 2001)).

The ALJ may also consider factors such as (1) the nature, location, onset, duration, frequency, radiation, and intensity of any pain; (2) precipitating and aggravating factors (e.g., movement, activity, environmental conditions); (3) type, dosage, effectiveness, and adverse side-effects of any pain medication; (4) treatment, other than medication, for relief of pain; (5) functional restrictions; and (6) the claimant's daily activities. *Id.* (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 346 (9th Cir. 1991)).  As these factors indicate, medical records can provide relevant information that impeaches the credibility of Plaintiff's testimony.  For example, medical records indicating that a claimant denied pain or reported only mild pain in a particular body part, may properly be used to discount her later claims of severe pain in that body part.

Plaintiff argues that the ALJ based his credibility determination, in part, on her ability to perform activities of daily living, but failed to identify the activities on which his finding was based.  *Motion for Reversal* (ECF no. 15), at 7-8.  The ALJ, however, made specific reference to Plaintiff's ability to cook breakfast for her daughter, get her children ready for school, shop with her husband and watch television.[4]  He also noted that the Plaintiff only had difficulty performing household chores after a seizure.  She did not have such problems prior to one.  AR 76.  Plaintiff's assertion that the ALJ did not identify the activities of daily living on which he relied is therefore incorrect.

Plaintiff also argues that the ALJ may not rely on evidence of activities that do not contradict the claimant's testimony or which fail to meet the threshold of applying in a work setting.  *Id.* at 8 (citing *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007)).  Plaintiff's criticism of the ALJ's decision on this basis has some merit.  As the court stated in *Garrison v. Colvin*, 759 F.3d 995, 1016 (9th Cir. 2014), "ALJs must be especially cautious in concluding that daily activities are inconsistent with testimony about pain, because impairments that would unquestionably preclude work and all the pressures of a workplace environment will often be consistent with doing more than merely resting in bed all day."  Many home activities are not

---

[4] Plaintiff also testified that she cooked dinner for her family, but the ALJ did not mention this activity in his decision.  AR 76, 91.

easily transferable to a work environment where it might be impossible to rest periodically or take medication. *Id.* (citation and quotation marks omitted).

Plaintiff's seizures did not affect her ability to engage in activities of daily living, except when she had a grand mal seizure and was experiencing the resulting symptoms of pain and fatigue. With respect to these seizures, the resulting symptoms lasted from one to two hours. There was no evidence that Plaintiff was unable to perform her regular activities during the onset period prior to a seizure. Nor was there evidence that she was significantly impaired by the more frequent, but momentary and less severe, seizures that her husband described to Dr. Moore.

There was also conflicting information regarding the frequency and duration of Plaintiff's seizures. Plaintiff stated in her October 2012 questionnaire that she had seizures approximately once a month and provided specific dates for her last four seizures. AR 228. Plaintiff's husband told Dr. Moore that her grand mal seizures occurred once every three months.[5] The minor or momentary seizures occurred more frequently. Plaintiff told Dr. Andryjowicz on February 1, 2013 that she had seizures once a month. AR 285. She told Dr. Andalib on March 4, 2013 that she had seizures three to four times a month. AR 322. That same day, she reportedly told another medical provider that she had seizures once a month. AR 327. On May 24, 2013, Dr. Andryjowicz noted that Plaintiff was taking Keppra and was not having seizures. AR 520. She reported to Dr. Andalib on October 7, 2013, that she had a grand mal seizure once a month since delivering her baby in April 2013. AR 536. In January 2014, she told Dr. Andalib that she was having generalized seizures every couple of days. AR 568. On January 29, 2014, Dr. Casillas stated her seizures were well-controlled with Keppra. AR 633. Plaintiff testified at the March 20, 2014 hearing that she had four to five seizures a month. She did not distinguish between the grand mal seizures and the less severe and momentary seizures that her husband described. On

---

[5] Neither Plaintiff's husband or Dr. Moore used the term "grand mal." The husband's description of the seizures matches the definition of a grand mal seizure. According to the Mayo Clinic website, a grand mal seizure causes loss of consciousness and violent muscle contractions. During the tonic phase, the muscles contract and cause the person to fall down. This phase tends to last 10 to 20 seconds. During the clonic phase, the muscles go into rhythmic contraction, and convulsions usually last one to two minutes or less. The seizures may also be accompanied by loss of bowel or bladder control, confusion, fatigue and severe headaches. https//www.mayoclinic.org/diseases-conditions/grand-mal-seizure/symptoms. Accessed by the Court on January 29, 2019.

1    July 30, 2014, Plaintiff told Dr. Andalib that she was still having seizures every other week.  AR

2    479.

3            The ALJ did not discuss this conflicting information regarding the frequency and

4    duration of Plaintiff's seizures.  The implication of his residual functional capacity assessment,

5    however, was that Plaintiff's seizures did not occur with such frequency, severity and duration as

6    to prevent her from engaging in full time, gainful employment.

7            The ALJ discounted Plaintiff's credibility based on the fact that she ceased taking seizure

8    medication, Dilantin, four years prior to her application for disability benefits.  He also noted the

9    lack of a significant prior history of medical treatment for seizures or more recent emergency

10   room visits for severe seizure episodes.  AR 76.  Plaintiff argues that the ALJ may not reject the

11   credibility of a claimant's testimony on this basis if she had good reason for not seeking

12   treatment, such as being uninsured or unable to pay for medical treatment.  *Motion to Reverse*

13   (ECF No. 15) at 10 (citing *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996); *Regennitter v.*

14   *Comm'r of Soc. Sec. Admin.*, 166 F.3d 1294, 1297 (9th Cir. 1999); *Orn v. Astrue*, 495 F.3d 625,

15   638 (9th Cir. 2007)).

16           Plaintiff points to a purported statement in the record that she was unable to obtain an

17   EMG because she could not afford the co-pay.  *Id.*  The ALJ did not cite the failure to obtain the

18   EMG as grounds for rejecting Plaintiff's credibility.  Nor does the record show that Plaintiff was

19   unable to pay the copayment.  It states that Plaintiff "had problem with copay show [sic] did not

20   show up for EMG."  AR 481.  It is conceivable from this statement that Plaintiff didn't want to

21   make the copayment and therefore opted-out of the EMG.  There is no evidence that she was

22   uninsured or financially unable to pay for medical care.  To the contrary, the reference to

23   "copay" indicates that Plaintiff had medical insurance.  She was, in fact, treated regularly at the

24   Kaiser Permanente medical center in Fontana, California during and after her pregnancy in 2013-

25   2014.  Plaintiff's belated assertion that she did not pursue medical treatment due to lack of

26   insurance of financial difficulties is without merit.  The ALJ properly discounted Plaintiff's

27   credibility based her having ceased taking anti-convulsant medication four or five year before

28   she applied for disability benefits.  His credibility determination was also supported by the lack

14

of other medical treatment for seizures prior to Plaintiff obtaining medical care for her pregnancy in 2013.

Plaintiff argues that the ALJ was required to confront her with the alleged inconsistencies in her statements or testimony and afford her the opportunity to provide an explanation. Plaintiff relies on cases involving administrative hearings before immigration judges. *Motion* (ECF No. 15), at 10-11 (citing *Campos-Sanchez v. INS*, 164 F.3d 448, 450 (9th Cir. 1999) and *Soto-Olarte v. Holder*, 555 F.3d1089, 1092 (9th Cir. 2009)). District courts in the Ninth Circuit have rejected the argument that there is a confrontation requirement in Social Security disability cases. *George v. Berryhill*, 2017 WL 3383117, at *12 (E.D.Cal. Aug. 7, 2017) (citing *Milosevich v. Colvin*, 2016 WL 738420, at *4 (C.D. Cal. Feb. 23, 2016); *Mulay v. Colvin*, 2015 WL 1823261, at *6 (C.D. Cal. Apr. 22, 2015); *Amezquita v. Colvin*, 2016 WL 1715163, at *7-8 n. 4 (C.D. Cal. Apr. 28, 2016); *Kocher v. Colvin*, 2015 WL 6956529, at *8 (D. Nev. Sept. 29, 2015); and *Montelongo v. Colvin*, 2014 WL 4627245, at *10 (E.D. Cal. Sept. 16, 2014)). *See also Lopez v. Colvin*, 2016 WL 5858712, at *2 (D.Nev. April 25, 2016). This Court agrees that there is no *per se* requirement that an ALJ confront the claimant about inconsistencies in her statements, testimony or conduct. *See Tonapetyan v. Halter*, 242 F.3d 1144, 1148 (9th Cir. 2001). If an inconsistency is questionable, however, the court may find that the ALJ did not provide legitimate reasons for relying on it, particularly if he did not give the claimant an opportunity to address it.

The ALJ noted the inconsistency between Plaintiff's statement to Dr. Andalib on March 4, 2013 that she stopped taking Dilantin five years earlier and her statement to Dr. Moore in December 2012 that she last took anticonvulsant medications five months prior to her examination. The ALJ did not specifically discount Plaintiff's credibility based on this apparent inconsistency. He discounted her credibility based on the fact that she stopped taking seizure medication several years prior to applying for Social Security benefits. Plaintiff stated on several occasions, including in her seizure questionnaire, that she stopped taking Dilantin several years before she applied for disability benefits.

Plaintiff also argues that the ALJ's repeated references to the presence of a Spanish language interpreter at the hearing, and the apparent importance he attached to that fact, indicates some bias or prejudgment on his part. *Motion* (ECF No. 15), at 13-14. The attention that the ALJ gave to this fact may have been overstated. It is reasonable to infer, however, that he wanted to eliminate any issue about Plaintiff's ability to understand the questions posed to her during the hearing or during her medical appointments and examinations. The ALJ's references to the Spanish language interpreter does not support a finding of bias on his part.

Finally, Plaintiff argues that new and material evidence not before the ALJ mandates reversal. On May 28, 2015, Morton Hyson, M.D., completed a medical questionnaire form in which he opined that Plaintiff was permanently disabled due to seizures. AR 16. A medical opinion solicited and produced after an adverse ALJ decision is less persuasive than those presented to the ALJ for consideration. *Matthewson v. Colvin*, 2013 WL 3467316, at *6 (C.D.Cal. July 10, 2013) (citing *Macri v. Chater*, 93 F.3d 540, 544 (9th Cir. 1990)). In addition, the ALJ and the Commissioner are not required to accept a medical opinion that is brief, conclusory, and inadequately supported by clinical findings. *Bayliss v. Barnhart*, 427 F.3d 1211, 2016 (9th Cir. 2005) (citing *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001)). *See also Cherpes v. Berryhill*, 727 Fed.Appx. 319, 321 (9th Cir. June 15, 2018) (memorandum opinion)). Dr. Hyson's May, 2015 questionnaire responses are the epitome of a conclusory and inadequate medical-legal opinion. It does not support reversal of the ALJ's decision.

As stated above, the ALJ's decision was inadequate and not well supported with respect to whether Plaintiff's activities of daily living contradicted her statements and testimony regarding the severity of her seizures. The ALJ did, however, provide clear and convincing reasons for discounting the credibility of Plaintiff's testimony regarding her seizures based on her lack of prior medical treatment and her not taking previously prescribed seizure medication for several years. There is no credible explanation for Plaintiff not taking anti-seizure medication if her symptoms were as severe as she claimed. Plaintiff had the burden of proving

. . .

. . .

that her symptoms and limitations were disabling.  Although there was some evidence that could support a conclusion that her seizures were disabling, there was substantial other evidence to support the ALJ's contrary conclusion.  Accordingly,

## RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that Plaintiff's Motion for Reversal and/or Remand (ECF No. 15) be **denied** and that the Commissioner's Cross-Motion to Affirm (ECF No. 17) be **granted**.

## NOTICE

Pursuant to Local Rule IB 3–2, any objection to this Finding and Recommendation must be in writing and filed with the Clerk of the Court within fourteen (14) days. The Supreme Court has held that the courts of appeal may determine that an appeal has been waived due to the failure to file objections within the specified time. *Thomas v. Arn*, 474 U.S. 140, 142 (1985). This circuit has also held that (1) failure to file objections within the specified time and (2) failure to properly address and brief the objectionable issues waives the right to appeal the District Court's order and/or appeal factual issues from the order of the District Court. *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

Dated this 31st day of January, 2019.

_____
**GEORGE FOLEY, JR.**
**UNITED STATES MAGISTRATE JUDGE**